IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SARAH H. GABRIEL, DVM,<br><br>Plaintiff,<br><br>v.<br><br>THE OHIO STATE UNIVERSITY, BOARD OF TRUSTEES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 2:26-cv-01720<br><br>Judge Algenon L. Marbley<br><br>Magistrate Judge Chelsey M. Vascura |

# MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION

# FOR A PRELIMINARY INJUNCTION

## INTRODUCTION

Dr. Sarah Gabriel is a second-year resident in Equine and Large Animal Internal Medicine. On September 24, 2026 she was sent home from the Veterinary Medical Center. She has not been permitted to perform a clinical duty on any day since. In that period the University has given her no written statement of her employment or training status, no identification of the policy or authority under which she is excluded, no allegation she might answer beyond a single dosing error she reported herself, and no date on which the exclusion ends. Her counsel has asked for each of those things, in writing, seven times. Her section head has not communicated with her at all.

What the University has said cannot be reconciled with itself. On October 12, 2026 the College's Director of Human Resources wrote that Dr. Gabriel is "not on any sort of administrative leave," that "there is no formal investigation being performed," and that she is "simply not permitted to work on clinical cases until further notice." Two days later the same office wrote that the matter "remains under review." On November 1, 2026 the University's Deputy General Counsel wrote that it "does seem that Ms. Gabriel has had more incidents than

just one dosing error," and identified no incident beyond the September 23 error, no date and no patient. Asked on November 6 to identify them, she did not reply.

That is the same form the March 27, 2026 probation letter took. Across seven enumerated areas of alleged deficiency, including dosing errors said to pose "significant patient safety risks" and knowledge gaps said to impair clinical reasoning, that letter identifies no patient, no date, no occasion and no complainant. It was issued ten weeks after its own author rated Dr. Gabriel's overall performance Satisfactory and declined to flag any concern to the Vice Chair for House Officer Success. What the letter does enumerate is, in substance, a list of the ways attention-deficit/hyperactivity disorder presents, in a resident whose diagnosis the author had known of since she disclosed it to him in her first six months.

Dr. Gabriel does not ask this Court to resolve that dispute now. She asks it to stop the clock while the dispute is resolved. Clinical training in a residency approved by the American College of Veterinary Internal Medicine is quantified, time-limited and reported to a certifying board. It cannot be made up later and it cannot be bought. Every day of exclusion is a day of training that no judgment at the end of this case can return to her.

The relief requested is narrow. Dr. Gabriel asks only that the Court order the University to restore her to clinical duties, under the supervision of Dr. Teresa Burns, a member of the section faculty who is not a respondent in the University's own pending civil rights investigation and who has agreed to serve as her advisor. She does not ask the Court to expunge the probation letter, award damages, or decide the merits. She asks to be allowed to do the work she is paid to do while this case proceeds.

## STATEMENT OF FACTS

The facts are set out in the Declaration of Sarah H. Gabriel, DVM, filed herewith, and in the exhibits to it. They are summarized here only as necessary.

A. The appointment and the disability.

Dr. Gabriel was appointed a Veterinary Resident for a three-year term beginning July 15, 2025. She has ADHD and she gets migraines, for which she takes prescription medication. She disclosed her ADHD to Dr. Ramiro Toribio, the Equine Medicine section head, and to two other faculty members during her first six months, explaining that it is the reason she does certain things differently and does not process auditory instruction in the same way. She disclosed it again in detail to Dr. Laura Dunbar Hostnik on April 19, 2026, a meeting recorded in the University's own Notices of Allegations. She told Dr. Hostnik in writing on March 11, 2026 that she gets migraines and takes medication for them.

At no point has anyone at the University initiated an interactive process with Dr. Gabriel, asked her before October 15, 2026 what accommodation would assist her, or conducted an individualized assessment. The only reference she has received to the University's ADA Coordinator came on October 15, 2026, three weeks after her removal from clinical duties, in standard form text appended to a notice of allegations issued in a different process, which directed her to request accommodations herself. Since then, the University has put no accommodation in place that would permit her to return to clinical duties.

B. The January 13, 2026 evaluation.

On January 13, 2026, Dr. Toribio completed Dr. Gabriel's six-month evaluation. He rated her overall performance Satisfactory. He checked "No" to whether any issue should be flagged to the Vice Chair for House Officer Success. He wrote that she was "back on track, making progress now," "in line with stage of residency training," and "professional, collegial, curious."

C. The March 27, 2026 probation letter.

Ten weeks later Dr. Toribio placed Dr. Gabriel on twelve weeks of probation with possible dismissal. The letter identifies no patient, no date, no occasion and no complainant. Its enumerated concerns are inconsistent active listening, communication that is "disorganized,

omitting relevant information," becoming "overly focused on individual cases at the expense of others," an inability to "manage multiple patients in parallel," a failure to "avoid distractions," and a failure to be punctual. The prescribed remedy in every instance is that Dr. Gabriel cease exhibiting the described trait. The letter offered her time off for medical appointments and referred her to the Employee Assistance Program, and took no step to accommodate anything.

The Residency Program Handbook, which the offer letter incorporates into Dr. Gabriel's employment, required that the letter contain "specific examples." It required that a Letter of Deficiency be issued first, absent an election by the Section Head and the Vice Chair for House Officer Success to bypass it. It required that the Section Head and the Vice Chair jointly issue probationary status and jointly determine the content of the letter and the benchmarks for removal from probation. None of that occurred.

Dr. Gabriel completed the twelve weeks. Under the Handbook, "failure to meet the benchmarks at the conclusion of the probation period will result in dismissal." She was not dismissed. By the University's own rule, she met them. No further action followed.

D. September 23 and 24, 2026.

On September 23, 2026, Dr. Gabriel identified a dosing error in the hospital's treatment software, in which two medications had been dosed against a weight of 350 kilograms rather than 350 pounds. She identified it herself and self-reported it to Dr. Toribio that evening. Recheck blood work confirmed the patient suffered no harm. Dr. Toribio instructed her not to file a patient safety report. The software had been in clinical use in the section for approximately two to three weeks.

The following day, September 24, Dr. Toribio told Dr. Gabriel she was removed from clinical duties, characterizing the error as part of a "pattern," and she was sent home. That same day she met with an Associate Dean of the College, told her she believed she had been discriminated against because of her ADHD, and the following night filed her own complaint with the University's Civil Rights Compliance Office. On September 25 the College's Director

of Human Resources and a faculty member interviewed her and told her they would contact her about her status the following week. No one did.

E. The period since.

The Civil Rights Compliance Office opened an investigation on October 13, 2026 and issued Notices of Allegations on October 15, 2026 naming Dr. Toribio and Dr. Hostnik as respondents in a formal investigation of disability discrimination and harassment. The exclusion has continued without interruption through all of it.

On October 2 and October 13, 2026, Dr. Gabriel asked Dr. Toribio in writing to sign the letter required to complete her registration for the 2027 ACVIM General Examination. It required only his electronic signature. He did not respond to either request, and signed only on October 15, 2026, the deadline.

The American College of Veterinary Internal Medicine, which approves the residency program and credentials its residents, told Dr. Gabriel on November 3, 2026 that it would reach out to her Program Director to better understand her current training status and, if needed, involve its Residency Training Committee to determine how the time should be documented for credentialing purposes, and that it had noted her request to change her Resident Advisor to Dr. Teresa Burns. ACVIM has since informed Dr. Gabriel that Dr. Burns has agreed to serve as her advisor. The Defendant has not answered any of ACVIM's questions about the basis for the exclusion, its duration, or the treatment of the lost training time.

Dr. Gabriel has sought relief from every available quarter. She complained to the Associate Dean and to the Civil Rights Compliance Office. She escalated to the University's central Office of Human Resources, which answered none of her five written questions and referred her back to the College. Her counsel wrote to the Office of Legal Affairs seven times. She wrote to the American College of Veterinary Internal Medicine, which has said it will inquire of her program. She filed a charge with the Equal Employment Opportunity Commission. Not one of those bodies has restored a single day of her training, and none of them can.

## ARGUMENT

### I. The standard.

A court weighs four factors on a motion for a preliminary injunction: the movant's likelihood of success on the merits, whether she will suffer irreparable harm without the injunction, whether the injunction would cause substantial harm to others, and whether the public interest would be served. Fed. R. Civ. P. 65(a); *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

These are factors to be balanced, not prerequisites to be met. The Sixth Circuit confirmed this principle this year, holding that a district court errs by requiring a movant to establish each factor by clear and convincing evidence, that no single factor is controlling, and that the question is whether the factors taken together clearly favor relief. *PCC Airfoils, LLC v. Daugherty*, 176 F.4th 509, 512-13 (6th Cir. 2026).

One qualification applies. The existence of irreparable injury is mandatory, even though its extent may be weighed against the other factors. *D.T. v. Sumner County Schools*, 942 F.3d 324, 327 (6th Cir. 2019). Dr. Gabriel addresses that factor in Section IV, and demonstrates an injury that is both certain and incapable of monetary repair.

### II. The order sought restores the status quo rather than altering it.

From July 15, 2025 until September 24, 2026, Dr. Gabriel performed clinical duties. That was the settled and uncontested state of affairs for fourteen months. The Defendant altered it unilaterally on September 24, 2026, without written notice, without identifying the policy or authority relied upon, without stating an allegation beyond the September 23 error, and without placing Dr. Gabriel in any defined employment or training status at all.

An order restoring Dr. Gabriel to clinical duties does not disturb a settled arrangement. It returns the parties to the arrangement that existed before the Defendant changed it, and to the arrangement the Defendant's own appointment documents contemplate for the full term ending

July 14, 2028. The Defendant continues to employ Dr. Gabriel and continues to pay her. The relief sought asks it to permit her to do the work it is already paying her to do.

In any event, the characterization does not change the inquiry. Under *PCC Airfoils* the four factors are weighed together, and here they converge.

III. Dr. Gabriel is likely to succeed on the merits.

*A. Section 504 applies and the Defendant's immunity is waived.*

The Defendant receives federal financial assistance. Ohio has waived Eleventh Amendment immunity from suit under Section 504 by accepting those funds. 42 U.S.C. § 2000d-7(a)(1); *Nihiser v. Ohio Environmental Protection Agency*, 269 F.3d 626, 628 (6th Cir. 2001). That is a waiver, not an abrogation, and it is therefore untouched by the abrogation analysis applied to Title I and Title V of the Americans with Disabilities Act.

The Complaint pleads no claim under the Americans with Disabilities Act against the Defendant, and no claim of retaliation under Section 504. Those omissions are deliberate. The Plaintiff seeks relief only under Section 504.

*B. Dr. Gabriel is an individual with a disability.*

Dr. Gabriel has attention-deficit/hyperactivity disorder. She processes verbal information more slowly than most people, and when she is focused on a procedure she does not hear what is said to her. Compared with most people in the general population, those are substantial limitations on concentrating and communicating and on brain function. 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(j)(1)(ii). The standard "is not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i). Migraine is episodic, and an impairment that is episodic is a disability if it would substantially limit a major life activity when active. 42 U.S.C. § 12102(4)(D). Mitigating measures, including medication, are disregarded in the determination. 42 U.S.C. § 12102(4)(E)(i).

The Defendant's knowledge is not in dispute and does not depend on Dr. Gabriel's testimony alone. Her disclosure of the ADHD to Dr. Hostnik is recorded in the Defendant's own

Notices of Allegations. Her disclosure of the migraines is in a text message from Dr. Hostnik, who answered, "Thank you! Do you need any meds?" That exchange is dated March 11, 2026, sixteen days before the probation letter.

*C. Dr. Gabriel is qualified to perform her clinical duties.*

Ten weeks before the probation letter the Defendant rated Dr. Gabriel's overall performance Satisfactory and declined to flag any concern to the Vice Chair for House Officer Success. She then completed twelve weeks of probation. The Defendant's own Handbook provides that failure to meet the benchmarks at the conclusion of a probation period "will result in dismissal." She was not dismissed. By the Defendant's own rule she met them. In fifteen months no patient in her care has been harmed.

The Defendant assessed Dr. Gabriel against the probation letter's own competencies and recorded that she met them. In the final probation evaluation, covering June 29 to July 12, 2026 and completed on July 17, 2026, Dr. Toribio recorded that Dr. Gabriel met expectations on Patient Care, on Medical Records, on Communication, on Time Management, and on Medical Knowledge and Clinical Reasoning. Four days later he completed her semi-annual evaluation for the period that contained the probation. He rated her overall performance Satisfactory. He answered "No" to whether any issue should be flagged to the Vice Chair for House Officer Success. He wrote that she "made progress in the specific areas, which is positive since it is our goal that she is successful in this program," and he listed among her strengths "Communication with the faculty," "Receptive to feedback," "Patient care," and "Professional, collegial, curious."

Dr. Burns, evaluating the same period, also rated her Satisfactory, also declined to flag any issue, and wrote that what was going well was "Excellent, attentive patient care" and "Tangible improvement in communication, efficiency, and anticipation in the clinic." Of the three faculty members who evaluated that period, only Dr. Hostnik, a respondent in the Defendant's own civil rights investigation, rated her Borderline.

The Defendant's own client satisfaction surveys say the same thing. On May 19, 2026, during the probation period, the owner of a horse Dr. Gabriel treated wrote through the

University's survey system that "[c]ommunication with me was consistent, informative, and engaging," and that "[t]his was a difficult case, both clinically and emotionally, and the treatment was superb." The College's Customer Experience office forwarded that survey to Dr. Gabriel and thanked her and her team for it. The probation letter then in force states that her communication is "disorganized, omitting relevant information."

Nine weeks after rating her Satisfactory and declining to flag her, Dr. Toribio removed Dr. Gabriel from clinical duties and told her the dosing error was part of a "pattern." Three weeks after that, on October 15, 2026, he signed the letter her certifying board required, which by its terms confirms "dates of program & satisfactory progress." The Defendant has never reconciled those documents with the exclusion, and it has never tried.

*D. The adverse actions were taken by reason of the disability.*

Section 504 prohibits exclusion from a program "solely by reason of her or his disability," 29 U.S.C. § 794(a), and provides that the standards applied under Title I of the Americans with Disabilities Act govern employment complaints, 29 U.S.C. § 794(d). The Sixth Circuit has held that the Americans with Disabilities Act requires but-for causation, abandoning for that statute the sole-cause requirement it had earlier drawn from the Rehabilitation Act. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 317, 321 (6th Cir. 2012) (en banc).

The Court need not resolve which formulation governs, because this record satisfies either one, including the sole-cause standard that Lewis leaves with the Rehabilitation Act, 681 F.3d at 317. The only incident the Defendant has identified as a reason for keeping Dr. Gabriel off clinical service is a single dosing error, made in software that had been in clinical use in the section for approximately two to three weeks, which she identified and reported herself the same evening, which harmed no patient, and which her section head told her not to report through the hospital's patient safety system. The Defendant has identified no other incident as a basis for the exclusion, to Dr. Gabriel or to her counsel across seven letters. Its Director of Human Resources has written that no formal investigation is being performed, and although Dr. Gabriel was told at her September 25 interview that she would hear the following week, no one contacted her about

her status for seventeen days. One self-reported error of that kind does not explain an exclusion of indefinite length with no finding and no end date. Against that record stands the probation letter.

What that letter enumerates is the disability. Inconsistent active listening. Communication that is "disorganized, omitting relevant information." Becoming "overly focused on individual cases at the expense of others." An inability to "manage multiple patients in parallel." A failure to "avoid distractions." A failure to be punctual. Those are not professional failings that happen to coincide with attention-deficit/hyperactivity disorder. They are its presentation, set out in a disciplinary letter by an author who had known of the diagnosis for months. In each instance what the letter directs is that Dr. Gabriel stop exhibiting the trait. An instruction to a disabled employee to cease exhibiting the symptoms of her disability is not a performance plan. It is the adverse action.

*E. The Defendant never engaged in the interactive process.*

Dr. Gabriel asked for an accommodation. When Dr. Hostnik wanted her to do something differently during a procedure, Dr. Gabriel asked her to take her hand, because when she is focused on a procedure she does not hear what is said to her, and Dr. Hostnik agreed. On September 25, 2026, she asked the Defendant in writing for "[r]eferral to the appropriate University office to discuss reasonable accommodations." That day the Defendant's Director of Human Resources interviewed her about the dosing incident and told her she would be contacted about her status the following week; no one contacted her. On October 12, 2026, the same Director wrote, without mentioning accommodation, that Dr. Gabriel was "simply not permitted to work on clinical cases until further notice" and would "be considered absent" if she returned to California and did not attend classes and journal clubs, and on October 14 that the matter "remains under review." No one asked her what would help. No individualized assessment was conducted. No adjustment was proposed to how instructions or feedback were delivered. On October 15, 2026, three weeks after her removal, notices of allegations issued in a different process carried standard form text telling the parties to request any accommodation needed

during that investigation. Since then the Defendant has put no accommodation in place that would permit her to return to clinical duties.

*F. The Defendant's stated process was not followed.*

The Residency Program Handbook, incorporated into Dr. Gabriel's appointment, required that a probation letter contain "specific examples." It required that a Letter of Deficiency issue first. It required that the Section Head and the Vice Chair for House Officer Success jointly issue probationary status and jointly determine the content of the letter and the benchmarks for removal. None of that occurred. An employer that departs from its own written procedure at every step, in the course of taking an adverse action against an employee whose disability it knows of, supplies the evidence of pretext itself.

The exclusion that followed has no stated basis beyond an open-ended review in which the only incident identified is a single dosing error. On October 12, 2026 the College's Director of Human Resources wrote that Dr. Gabriel is "not on any sort of administrative leave," that "there is no formal investigation being performed," and that she is "simply not permitted to work on clinical cases until further notice." If that is accurate, there is no leave, no investigation, and therefore no identified authority for keeping a resident off clinical service for nearly two months. If it is not accurate, the Defendant has given its own employee a written account of her status that is false. Either way, the Plaintiff is likely to prevail.

<u>IV. Dr. Gabriel is suffering irreparable harm, and it accrues daily.</u>

Harm is irreparable when it is not fully compensable by money damages, including where the nature of the loss makes damages difficult to calculate. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511-12 (6th Cir. 1992).

*A. This is not a case about the loss of a job.*

The ordinary rule that the loss of employment is not irreparable rests on the availability of the ordinary remedies. An employee who is discharged can be awarded back pay and reinstated, and those remedies restore what was taken. *Sampson v. Murray*, 415 U.S. 61 (1974).

Dr. Gabriel has not been discharged. She holds her appointment. She is paid her salary. There is no position to reinstate her to, because she already occupies it, and there is no back pay to award, because no pay has been withheld. The remedy that makes the ordinary employment case reparable is unavailable here for the simple reason that the ordinary injury has not occurred. What has been taken from Dr. Gabriel is not her job. It is the training her job exists to provide.

*B. The clinical training cannot be recovered, and the time in which to earn it is running out.*

A three-year residency approved by the American College of Veterinary Internal Medicine is not fungible employment. The training is quantified in weeks of clinical service, it is reported to a certifying board, and it is bounded by the term of the appointment. Dr. Gabriel's appointment ends July 14, 2028. The weeks that remain in it are already committed to the training they were scheduled to provide. A week of clinical service lost in November 2026 cannot be performed in its place, because there is no empty week waiting at the end to receive it.

Eligibility to sit for the specialty board examination depends on completing that clinical training. The exclusion therefore does not merely postpone Dr. Gabriel's credential. It consumes the finite period in which the credential can be earned at all. The loss is not deferred until judgment. It is complete on the day it occurs, and it has occurred on every day since September 24, 2026.

*C. The statute itself forecloses the monetary remedies that would otherwise repair this.*

Emotional distress damages are unavailable under Section 504. *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212 (2022). Punitive damages are unavailable. *Barnes v. Gorman*, 536 U.S. 181 (2002). Dr. Gabriel's salary has continued, so there is no lost wage to recover. Setting aside the per-shift compensation she no longer earns for after-hours emergency coverage, the monetary relief available to her at the end of this case approaches nothing.

That is not an argument about the size of a future award. It is the reason this harm meets the standard. A loss that the governing statute places beyond the reach of damages is, by

definition, a loss that damages cannot repair. If Dr. Gabriel is to be restored at all, she must be restored now.

*D. The delay is the Defendant's, not hers.*

Dr. Gabriel did not come to this Court first. She reported internally on September 24, 2026. She sat for an interview the next day and waited the week she was told to wait. She waited through seventeen days of silence, then through two written statements that cannot both be true, then through the opening of a civil rights investigation in which her section head and her attending are the respondents. Her counsel wrote seven times. She escalated to the Defendant's central Office of Human Resources, which answered none of her five written questions and directed her back to the same people. She wrote to her certifying college. She filed a charge with the Equal Employment Opportunity Commission. None of it has returned a single day of training, and none of those bodies can.

A plaintiff who uses an employer's internal remedies before seeking emergency relief has acted reasonably. The Defendant cannot build a delay argument out of the weeks it spent declining to answer her.

## V. An injunction would cause the Defendant no cognizable harm.

The only incident the Defendant has identified as a basis for the exclusion is the single September 23 dosing error, and it has identified no other in answer to seven letters that asked precisely that question. Nor did it identify one when the American College of Veterinary Internal Medicine asked, as the body that approves the program. A university that will not tell its own specialty board why a resident is off clinical service, or when the exclusion ends, is not withholding an explanation it possesses.

Nor could it. The incident that preceded the removal was a dosing error that Dr. Gabriel identified and reported herself, in new software that had been in clinical use in the section for two to three weeks, which caused no harm to the patient, and which her section head instructed

her not to report through the hospital's patient safety system. Ten weeks before the probation letter the same section head rated her Satisfactory.

Dr. Gabriel asks to be supervised. The relief she seeks places her under Dr. Teresa Burns, a member of the section faculty who is not a respondent in the Defendant's investigation and who has agreed to serve as her advisor. The Defendant cannot say that no supervising faculty member is available, because one has already volunteered. If the Defendant has a genuine concern about Dr. Gabriel's clinical performance, supervised practice is the ordinary mechanism for addressing it. Exclusion is not.

VI. The public interest favors an injunction.

The public has an interest in the enforcement of federal law prohibiting disability discrimination by the recipients of federal funds, and in a federally funded teaching hospital that does not catalogue the symptoms of a known disability and call them professional deficiencies.

The public also has an interest in clinicians who report their own errors. In healthcare this is known as "just culture." Dr. Gabriel found a dosing error, reported it the same evening, was told not to file a patient safety report, and was removed from clinical duties the following day. Whatever else this case decides, the lesson that sequence teaches every house officer in the Veterinary Medical Center is contrary to the public interest in patient safety.

VII. The relief requested, and security.

Dr. Gabriel asks for an order directing the Defendant to restore her to clinical duties, under the supervision of Dr. Teresa Burns or any other member of the Equine Medicine section faculty who is not a respondent in the Defendant's pending civil rights investigation, pending final judgment. Dr. Burns has agreed to serve as Dr. Gabriel's advisor, so the order sought requires the Defendant to make no arrangement it does not already have available. Dr. Gabriel does not ask the Court to expunge the probation letter, to order any payment, or to resolve the merits.

The Court may require security in such sum as it considers proper. Fed. R. Civ. P. 65(c). Because the order sought requires the Defendant only to permit an employee it is already paying to perform the work she was hired to perform, the Defendant faces no monetary exposure from it, and a nominal bond is appropriate.

## CONCLUSION

Since September 24, 2026, the Defendant has kept a resident out of the training her appointment exists to provide, and in that time, it has identified no incident to justify it other than a single error she reported herself. It has given her no status, which means no process, no review, no appeal and no end date. The one thing the Defendant has never done is identify the rule that permits any of it.

Dr. Gabriel respectfully requests that the Court grant the motion.

Respectfully submitted,

/s/ Alex F. Freitag

Alex F. Freitag (0089336)
Trial Attorney for Plaintiff
Brian D. Bardwell (0098423)
SPEECH LAW LLC
4403 Saint Clair Avenue, Suite 400
Cleveland, Ohio 44103
Telephone: (513) 549-5517
Alex.Freitag@speech.law
Jonathan G. Gabriel (Cal. Bar No. 140381)
(pro hac vice motion forthcoming)
GABRIEL LAW GROUP, PC
PO Box 261697
Encino, California 91426
Telephone: (818) 578-8700
gabriellawgroup@gmail.com

*Counsel for Plaintiff Sarah H. Gabriel, DVM*