IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SARAH H. GABRIEL, DVM,<br><br>Plaintiff,<br><br>v.<br><br>THE OHIO STATE UNIVERSITY, BOARD OF TRUSTEES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 2:26-cv-__________<br><br>Judge ______________________<br><br>Magistrate Judge __________ |

DECLARATION OF SARAH H. GABRIEL, DVM
IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

I, Sarah H. Gabriel, DVM, declare as follows:

1. I am the Plaintiff in this action. I make this declaration in support of my motion for a preliminary injunction. The facts set out below are within my personal knowledge, except where I state that a matter is on information and belief, and as to those matters I believe them to be true. If called as a witness I could and would testify competently to them.

2. The documents attached as exhibits to this declaration are true and correct copies of documents I received, sent, or obtained in the ordinary course of my employment and of this dispute.

A. My appointment

3. I am a licensed veterinarian. On March 3, 2025, The Ohio State University offered me a full-time, fixed-term appointment as a Veterinary Resident in Equine and Large Animal Internal Medicine, beginning July 15, 2025 and ending July 14, 2028. I accepted. A true and correct copy of the offer letter is attached as Exhibit 1.

4. In the acceptance block of that letter I agreed to adhere to the policies and guidelines detailed in the VCS Residency Program Handbook. A true and correct copy of the

2025-2026 Residency Program Handbook, which was in effect throughout the events described below, is attached as Exhibit 2.

5. A residency in my field is a training appointment. Its substance is supervised clinical service, which is counted in weeks, recorded, and reported to the American College of Veterinary Internal Medicine, the body that determines whether I am eligible to sit for specialty board examinations. Clinical weeks I do not work are not made up later. The weeks that remain in my appointment are already allocated to the training they were scheduled to provide.

B. My disability

6. I have attention-deficit/hyperactivity disorder ("ADHD"). It affects my concentration, my processing of spoken instruction, and the way I organize verbal communication. I have processed spoken information more slowly than most people since childhood, and when I am focused on a task, such as a clinical procedure, I do not hear what is said to me. I also get migraines, for which I am under the care of a physician and take prescription medication. When a migraine is active I experience severe pain localized behind my left eye, and I get nauseous and cannot function.

7. Notwithstanding those conditions, I performed the work of the residency competently. I carried a full clinical caseload, took after-hours emergency shifts, managed patients on my own service, and taught veterinary students on clinics. In the fifteen months I worked on clinics, no patient in my care was ever harmed.

8. I have kept the cards and notes that owners of my patients sent to me. Several are from owners whose horses I euthanized, written to thank me for the care I gave the animal and for the way I explained to them what was happening. The probation letter states that my communication is "disorganized, omitting relevant information" and that my interactions are "perceived as defensive or dismissive." True and correct copies, with the owners' names redacted, are attached as Exhibit 3.

9. The Veterinary Medical Center surveys clients after their animals are treated. On two occasions the College's Customer Experience office forwarded my survey results to me. The first, completed December 2, 2025, concerned Vorn, a Friesian stallion I treated for an intestinal condition. The client rated every category "Great," including the doctor's ability to answer questions and explain things clearly, and wrote that I "communicated well." The second was completed May 19, 2026, during the probation period. The patient was Jett, a horse that had been attacked by dogs and did not survive. The client wrote that "[c]ommunication with me was consistent, informative, and engaging," that "[t]his was a difficult case, both clinically and emotionally, and the treatment was superb," and that I was "tremendous in attending to Jett, trying everything to arrest the infections and heal him." The office that forwarded that survey to me and to the attending clinician wrote, "Thank you, Drs. Gabriel and Balaa and to the whole team." These are the University's own records, not documents I kept. True and correct copies, with the clients' names redacted, are attached as Exhibit 4.

10. I also received cards from the veterinary technicians I worked alongside. One card, signed by two technicians, reads: "Thank you so much for all the help you have given Brittany & I recently. Know that your efforts haven't gone unnoticed. Thank you for keeping a positive attitude + team playing spirit during our busiest season! You're doing amazing!" and "Dr. Gabriel, Thank you so much for all of your help lately! The hospital has been crazy lately for everyone & I greatly appreciate all you've done for us!" A true and correct copy is attached as Exhibit 5.

11. During the first six months of my residency, faculty convened a meeting with me to tell me they had received complaints that I was condescending. At that meeting I disclosed to Dr. Ramiro Toribio, the Equine Medicine section head, to Dr. Laura Dunbar Hostnik, and to Dr. Teresa Burns that I have ADHD, and I explained that it is the reason I do certain things differently and do not process auditory instruction in the same way.

12. On April 19, 2026, I asked Dr. Hostnik that, if I was in the middle of a procedure and she wanted me to do something differently, she take my hand, because when I am that

focused on what I am doing I do not hear what is said to me. Dr. Hostnik agreed, however I continued to be told that I was not focused.

13. On or about April 19, 2026, I spoke with Dr. Hostnik at length and in confidence about my ADHD and explained that I process verbal information more slowly than neurotypical people. That conversation is recorded in the University's own Notices of Allegations, attached as Exhibit 6.

14. Before October 15, 2026, no one at the University asked me what accommodation would assist me. No one has ever conducted an individualized assessment of my condition. The only time the University has referred me to its ADA Coordinator was on October 15, 2026, three weeks after I was removed from clinical duties, in standard text at the foot of a notice of allegations issued in a different process, which told me to request an accommodation myself. Since then, the University has put no accommodation in place that would allow me to return to clinical duties.

## C. My six-month evaluation, January 13, 2026

15. On January 13, 2026, Dr. Toribio completed my six-month evaluation. He rated my overall performance Satisfactory. He answered "No" to whether any issue should be flagged to the Vice Chair for House Officer Success. He wrote that I was "back on track, making progress now," "in line with stage of residency training," and "professional, collegial, curious." A true and correct copy is attached as Exhibit 7.

16. At that point I had received no Letter of Deficiency, no remediation plan, and no Human Resources review of my performance.

## D. January 25 and 26, 2026

17. On January 25, 2026, twelve days after that evaluation, I was monitoring a patient using telemetry and an ECG monitor. Mandy Hutcheson, the head medicine technician on duty,

came to the stall and told me the leads were not correctly connected to the patient. I disagreed and continued to monitor the patient. I then left the stall to attend another patient.

18. Sometime later Ms. Hutcheson approached me holding the telemetry leads and said the patient had bitten them off because of the way I had placed them. When I questioned her, she added that the patient had also bitten the leads off the day before, and that the technicians working that shift had telephoned to report it.

19. Neither account was true. The patient did not bite the leads. No such calls were made to me or anyone else. I spoke with the technicians who worked that night and they confirmed they placed no calls about any such incident. Dr. Margaret Mudge was the senior attending who, other than me, would have received the call Ms. Hutcheson described, and Dr. Mudge confirmed to me that she received no such call.

20. A note about the telemetry leads appears in the comments block at the bottom of the second page of the patient's ICU flow sheet. It reads "10p Ate leads d/c'd." It was not in the record at the time of my interaction with Ms. Hutcheson. It was added afterward. Every hourly observation on that page is initialed by the technician who made it. The note is not. A true and correct copy of the ICU flow sheet is attached as Exhibit 8.

21. The record the note sits beneath cannot be reconciled with it. The comment immediately above the note, which carries different initials from the overnight entries, records that at 7:00 a.m. I was notified that the patient's heart rate was 200 and that the dobutamine was discontinued. Someone read that heart rate from the telemetry, judged it dangerous, called me, and stopped a cardiac drug because of it. The patient's heart rate is also charted at 148 at midnight and at 152 at 3:00 a.m. Telemetry is recorded as functioning in every hourly entry from 8:00 p.m. through 7:00 a.m. except the entry for 10:00 p.m., which records only "standing, QAR, no new feces, IVC ok, not in distress" and notes no incident of any kind. Telemetry cannot be monitored, and a heart rate cannot be read from it, if the leads have been eaten.

22. I reported the falsified entry. My report was verbal. So far as I am aware, no record of it was made, no investigation occurred, and no action was taken with respect to Ms.

Hutcheson, who remained in her position. When my counsel raised the matter with Dr. Page Yaxley on April 10, 2026, Dr. Yaxley said it was the first she had heard of it.

E. The probation letter, March 27, 2026

23. On March 27, 2026, ten weeks after rating me Satisfactory, Dr. Toribio placed me on twelve weeks of probation with possible dismissal, effective March 30, 2026. A true and correct copy of the letter is attached as Exhibit 9.

24. The letter identifies no patient, no date, no occasion and no complainant anywhere in its seven enumerated areas. I have read it many times. I do not know what incidents it refers to. I asked and I was not told.

25. Among the things the letter says are that my active listening is inconsistent, that my communication is “disorganized, omitting relevant information,” that I become “overly focused on individual cases at the expense of others,” that I do not “manage multiple patients in parallel,” that I do not “avoid distractions,” and that I am not punctual. In each case what it directs me to do is stop. These are the things I had told Dr. Toribio my ADHD affects.

26. Under the heading “Patient Care” the letter states that “instances of incomplete treatment orders, including errors in dosing, which poses significant patient safety risks, are unacceptable.” Under “Medical Knowledge and Clinical Reasoning” it states that “knowledge gaps and difficulty integrating clinical information have been observed to negatively impact your clinical reasoning.” Neither identifies an occasion, a patient or a date.

27. Paragraph 3 of the letter, headed “Communication,” states: “Technicians: Interactions at times are perceived as defensive or dismissive.”

28. The letter offered me time off for medical appointments and referred me to the Employee Assistance Program. No one asked whether an acknowledgment of my disability or any type of accommodation would help me. No one proposed training, mentoring, a change in assignment, or any adjustment to how instructions were given to me.

29. The letter designated Dr. Toribio, its author, as my clinical advisor. It directed that any rebuttal be submitted to Dr. Yaxley within seven days. It scheduled assessment meetings for May 18, 2026 and June 29, 2026.

30. I completed the twelve-week probation. No further action followed from it. No one told me I had failed to meet any benchmark, and I was not dismissed.

31. During the probation Dr. Toribio evaluated me at intervals on the competencies set out in the probation letter. Each of those evaluation forms states, above the first question, "Expectations for each competency is outlined in the initial probation letter."

32. In the last of them, covering June 29 through July 12, 2026 and completed on July 17, 2026, Dr. Toribio recorded that I met expectations on Patient Care, on Medical Records, on Communication, on Time Management, and on Medical Knowledge and Clinical Reasoning. On Prioritizing and Professional Focus he recorded "Improved, but below expectations." He wrote that my "improvement on medical records has been evident," that my "current attention to medical records should be her baseline new standard," and that I had "shown improvement in punctuality." A true and correct copy is attached as Exhibit 10.

33. On July 21, 2026, four days later, Dr. Toribio completed my semi-annual evaluation for the period January 1 through June 30, 2026, which is the period that contained the probation. He rated my overall performance Satisfactory. He answered "No" to the question whether he had encountered any issues that should be flagged to the attention of the Vice Chair, House Officer Success, and he checked none of the six areas listed beneath it. A true and correct copy is attached as Exhibit 11.

34. In that evaluation Dr. Toribio wrote: "Dr. Gabriel was placed in a 12-week period of probation based on concerns in different areas laid out in her letter of probation. She made progress in the specific areas, which is positive since it is our goal that she is successful in this program." Among the things he listed as going well for me were "Communication with the faculty," "Receptive to feedback," "Patient care," and "Professional, collegial, curious."

35. On July 20, 2026, Dr. Teresa Burns completed her semi-annual evaluation of me for the same period. She rated my overall performance Satisfactory and answered "No" to the same question about flagging issues to the Vice Chair. She wrote that what was going well was "Excellent, attentive patient care," "Interactions with clients that promote relationship-building; listens to clients and accommodates their needs," and "Tangible improvement in communication, efficiency, and anticipation in the clinic - has become much more proactive." A true and correct copy is attached as Exhibit 12.

36. On July 16, 2026, Dr. Hostnik completed her semi-annual evaluation of me for the same period. She rated my overall performance Borderline and identified Communication as an area to be addressed. Hers is the only evaluation of that period that does so. A true and correct copy is attached as Exhibit 13.

F. The ophthalmology consultation, April 6 and 7, 2026

37. On Monday, April 6, 2026, ten days after the probation letter issued and while I was on probation, a 2026 filly on my service was seen in an ophthalmology consultation. Two clinicians from the Ophthalmology service attended. A senior resident led the examination and I took part in it throughout. At the time I did not know which of the two clinicians was the resident and which was the attending.

38. After the examination I confirmed the findings and the treatment plan out loud with the senior resident who had led it. The plan was a steroid ointment, NeoPolyDex, to be applied to the left eye every twelve hours. I then went to prepare the treatment sheets with the veterinary student assigned to the case, and I went over the plan with the student while we did so.

39. Without my knowledge, the ophthalmology attending spoke separately to Dr. Hostnik. When the consultation had concluded, I told Dr. Hostnik that the plan was to apply the ointment every twelve hours. Dr. Hostnik told me that Dr. Davis wanted it applied every twenty-four hours. I told her that the senior resident had told me every twelve hours.

40. Later that evening Dr. Hostnik sent me a text message. She wrote: "A couple of things there: the foal should not have been let go until we had the neo poly dex the student went to get. Verifying with ophtho the plan - sid neo poly dex. You need to be focusing more on the task at hand than chatting, even if chatting about the case." A true and correct copy is attached as Exhibit 14. In veterinary medicine "sid" means once every 24 hours (from the Latin phrase *semel in die*).

41. I replied, "Will do. Thank you for the feedback." I then wrote that the ophthalmology clinician had said twice daily for the NeoPolyDex, and once daily only if that was all the owner could manage. Dr. Hostnik answered, "Ok Davis said Sid." She then wrote: "And sorry I would say these things in person but there is always a crowd you know."

42. I asked whether I could call her, and she agreed. On the telephone Dr. Hostnik said that she could look up the ophthalmology consultation report and check what I had told her. She looked it up.

43. The consultation report was entered by the ophthalmology clinician at 4:23 p.m. that afternoon. Under "Recommendations" it reads: "NeoPolyDex OS Q12-24 for 7 days." Q12 means every twelve hours. The plan I had recorded and given to the student was consistent with the written recommendation of the Ophthalmology service. A true and correct copy of the consultation report is attached as Exhibit 15.

44. Having read the report, Dr. Hostnik said that there must have been a misunderstanding with the ophthalmology department. She did not withdraw what she had written to me. She did not say that what I had recorded was supported by the record. She did not apologize.

45. The "chatting" Dr. Hostnik's message refers to was my going over the treatment plan with the veterinary student while we prepared the treatment sheets. Her own message acknowledges as much: "even if chatting about the case." I was not distracted during that appointment. I was working on the case.

46. As to the foal being released, the NeoPolyDex had to be obtained from the pharmacy and was going to take further time to arrive. When I went to tell Dr. Hostnik this, she was on the telephone. Interrupting her call did not seem to me to be respectful or called for. I was satisfied that the medication could be obtained afterwards, and I told the technicians to release the foal. Dr. Hostnik raised the point with me once she was off the telephone.

47. Dr. Hostnik continued after that day to cite this episode to me as an example of my not being focused.

48. This episode took the same course as the others. A criticism was put to me in writing rather than in person. It attributed a supposed failing to my not being focused, which is the trait my ADHD affects and which I had disclosed to Dr. Hostnik in confidence. It was made without anyone first asking me what had happened. The probation letter in force at the time directed me to "avoid distractions." And when the written record showed that the criticism had no basis, it was neither withdrawn nor corrected, and it continued to be used against me.

49. The following morning, Tuesday, April 7, 2026, I arrived at work and went to examine the same filly. Two technicians, whom I know as Sam and Mardy, tried to discourage me from going into the stall and performing the physical examination myself. Their manner was intimidating.

50. I said that I was going to perform the examination. They then offered to help me. I declined politely. They pushed back, saying that they were there and would help me. I said no thank you a second time. They pushed back again, saying, "why say no when the help is being offered." I said a third time that I appreciated the offer but did not need the help.

51. I went into the stall. I caught the foal without any difficulty and I performed the physical examination.

52. I had declined nothing other than an offer of assistance I did not need, on my own patient, and I had given no one any reason to take offense. An exchange of that kind is what would be reported to Dr. Toribio as my having been "defensive or dismissive," in the words the probation letter uses.

G. How Dr. Toribio gathered information about me

53. Dr. Toribio encouraged members of the technical and support staff to report to him, in confidence, their negative observations of me, including observations about my perceived attitude and my focus. He told me that he has an open door policy for any and all concerns that happen at work, and that he protects the confidentiality with which reports are made by employees even if they pertain to a resident, and form the basis of his critique of a resident.

54. He cited those confidential negative reports to me when criticizing me, including in the meetings held during the probation period. He would not tell me who had made any report, when it was made, or what occasion it concerned. He told me the reports were confidential and therefore protected. I could not answer any accusation because I was never permitted to learn what it was.

55. On June 26, 2026, I performed an emergency tracheostomy on a patient. A technician who was present reported to Dr. Toribio that I had not been focused while performing it.

56. Dr. Toribio raised that report with me at my next feedback meeting. He did not tell me who had made it. He was not on clinics during that period, he was not present for the procedure, and he had no firsthand knowledge of anything that occurred during it.

57. The report was not true, and Dr. Hostnik said so in the meeting. I had been on the telephone with Dr. Hostnik for the duration of the procedure. She said that I had been focused throughout.

58. What the technician objected to was the order in which I performed the steps of the procedure. That is a disagreement about clinical judgment, not about attention.

59. An allegation that a resident was inattentive while performing an emergency airway procedure is among the most serious that can be made about a clinician. It reached me from a section head who was not there, it did not reach me with the name of the person who

made it, and the attending who was on the telephone throughout said in the meeting that it was wrong.

60. The pattern with the technicians was consistent. A technician would tell me how I should do something. If I disagreed, or pushed back in any way, the technician would become visibly annoyed.

61. One example. Ear twitching is the manual twisting or grabbing of a horse's ear as a method of restraint. It is discouraged in contemporary equine practice as aversive. Technicians in the section used it as a preferred means of obtaining compliance from horses. By way of example, the veterinary assistant Jen Richards uses ear twitching as one of her favorite ways to control a horse. When I asked that my patients not be ear twitched, the technicians refused and told me they knew better than I did how to do their jobs. A disagreement of that kind is what would generate a report to Dr. Toribio that I had been "defensive or dismissive."

62. Neither Dr. Toribio nor Dr. Hostnik ever asked me about the basis of a disagreement with a technician. Neither ever suggested I should hold to my clinical judgment about the care of my patients. Nobody in the faculty has ever told me that I have the right to advocate for how I think it best to treat my patients.

63. Certain technicians address me as "Gabriel" rather than "Dr. Gabriel." They do not do this with the other residents.

H. My migraines, and what the University knew

64. On Wednesday, March 11, 2026, in a text exchange with Dr. Hostnik about patient care, I wrote: "Got a migraine so im just sitting in the res office." Dr. Hostnik replied: "Thank you! Do you need any meds?" I answered that I had taken some and that they should start working. I kept working through the episode, coordinating patient care from the resident office, and in the same thread offered to help with another patient. A true and correct copy is attached as Exhibit 16.

65. That exchange occurred sixteen days before the probation letter issued. The probation letter lists a failure to be punctual among its grounds.

66. On Wednesday, May 20, 2026, Dr. Hostnik texted me at 8:04 a.m. asking whether I was on my way. I answered: "I overslept." I then wrote: "Sorry im not feeling so well, I fell asleep at work at the end of the day in the office. Ill be in soon," and then wrote: "(Its a very bad migraine) I am taking my meds now, will be able to drive shortly." At 9:39 a.m. I wrote that I would go home after my patient was discharged and Dr. Hostnik answered "Ok." At 3:29 p.m. I wrote, "Im feeling a bit better thank you for letting me come home to rest. Still got the balaa sunnies on but I can function," referring to the sunglasses (that I had borrowed from Dr. Balaa) I need indoors during a migraine. A true and correct copy is attached as Exhibit 17.

67. Accommodating that episode took Dr. Hostnik one morning and cost the section nothing. It is the only time anyone at the University has accommodated my migraines, and no one ever discussed doing so as a matter of practice.

<u>I. June 27, 2026 and what followed</u>

68. On June 27, 2026, Veterinary Assistant Jen Richards, a veterinary student, and I were completing the workup of a foal with diarrhea and its mare in Isolation stall #10. Ms. Richards told me I needed to give the foal more sedation. I had given 100 mg of xylazine at the start, the foal was no longer moving, and in my clinical judgment we could finish without more. When I declined, Ms. Richards raised her voice and said, "sure whatever you want Gabriel," in a way that made both the student and me uncomfortable.

69. I reported the incident to Dr. Hostnik by text message the same day. I told her I was raising it because I was working on being a better resident and because this was the kind of moment I usually do not speak up about. A true and correct copy is attached as Exhibit 18.

70. Dr. Hostnik replied by text. She acknowledged that Ms. Richards "shouldn't have snapped like that," but then wrote: "Of course I don't know what was happening today but I have just observed that sometimes you can get side tracked or distracted and less efficient because of

that and that could really upset someone who is somewhat breaking their body to restrain for you." She suggested I approach Ms. Richards to reassure her "that you are trying." A true and correct copy is attached as Exhibit 19.

71. By her own account Dr. Hostnik did not know what had happened. She nonetheless attributed a staff member's outburst to my being "side tracked or distracted," which are manifestations of the ADHD condition I had disclosed to her in confidence nine weeks earlier.

72. On or about June 29, 2026, Ms. Richards gave me a three-page handwritten letter. It is addressed "Dear Gabriel," not "Dr. Gabriel." In it she writes: "At times I become frustrated because you have a tendency to become distracted or off task but I try to be understanding." She names Dr. Hostnik among the doctors who "trust me to keep them safe." A true and correct copy is attached as Exhibit 20.

73. I have never discussed my ADHD with Ms. Richards. The language in her letter, "distracted or off task," closely tracks Dr. Hostnik's text to me two days earlier, "side tracked or distracted."

74. On July 6, 2026, I told Dr. Hostnik about Jen Richard's letter, and how she had accused me of not being focused. I also stated that I had disclosed my ADHD to Dr. Hostnik and the other attendings in confidence and did not expect it would be shared with the technical staff or veterinary assistants.

75. Later that day, Dr. Hostnik sent me this text message: "I'm sorry that the situation went with Jen went that way it was my intention to explain that you were working on your side of things, *not for her to take my words*" (emphasis added). A true and correct copy is attached as Exhibit 21. I understood that message to confirm that Dr. Hostnik had discussed me with Ms. Richards after I reported the incident, and that the language in Ms. Richards's letter came from Dr. Hostnik.

J. September 2026

76. On or about September 1, 2026, Dr. Hostnik told me, "I can't trust you."

77. On September 6, 2026, Dr. Hostnik sent me an email itemizing what she described as my failures, including an assertion that I had not entered patients' stalls on particular mornings. A true and correct copy is attached as Exhibit 22.

78. I answered her point by point, by date and by patient, from the record. I explained that on August 19 I had obtained a heart rate of 48 myself and auscultated gut sounds in all four quadrants, neither of which is possible from outside a stall. I acknowledged what I had gotten wrong, including that I had not known of a fever charted the previous evening on August 17, and described the change I had made to how I review flow sheets. I also noted that the patient's own treatment plan required a call to the resident on call for any temperature above 101.5, that the 8:00 p.m. temperature was charted at 102.4, and that no call was made to me. A true and correct copy of my reply is attached as Exhibit 23.

79. Dr. Hostnik's itemization included an absence caused by my migraines, and identified the standard I was "falling short of" as, in part, "not arriving in time."

K. September 23, 24 and 25, 2026

80. The Veterinary Medical Center implemented treatment software called VetRadar in my section approximately two to three weeks before the events described in this section.

81. On September 23, 2026, after evening rounds with the technicians, I learned of a dosing error involving a foal in which two medications had been dosed against a weight of 350 kilograms rather than 350 pounds. I identified the error and I reported it to Dr. Toribio that same evening. Recheck blood work performed at 24 and 48 hours confirmed the patient suffered no harm.

82. Dr. Toribio instructed me not to file a patient safety report.

83. On September 24, 2026, Dr. Toribio, with Dr. Yaxley present, told me I was removed from clinical duties and characterized the dosing error as part of a "pattern." I was sent home. I have not performed a clinical duty on any day since.

84. The only other dosing issue in my residency occurred in my first few months. It involved a written request for a 100 mg/ml concentration of a drug the hospital stocked only in 200 mg/ml. Both concentrations exist and are widely used. The incorrect dose was never given to the patient.

85. Later on September 24, 2026, I met with Dr. Alison Gardner, Associate Dean for Education and Student Success. After listening to my story, she asked whether I believed I had been discriminated against because of my ADHD. I replied that I did. She told me she is a mandatory reporter and would report my concerns. The following day I filed my own report with the University's Civil Rights Compliance Office. A true and correct copy is attached as Exhibit 24.

86. On September 25, 2026, I was interviewed by Zoom by Kristi Pyke, the College's Director of Human Resources, and Dr. Yaxley, concerning the dosing incident. I was told they would contact me regarding my status the following week. No such contact was ever made. At neither the September 24 meeting nor the September 25 interview did anyone tell me to continue attending classes, journal club, book club or coursework. The first I heard of any such instruction was Ms. Pyke's email of October 12, 2026.

<u>L. The period since</u>

87. As of today, November 23, 2026, I have been excluded from clinical duties for sixty days.

88. In that time no one has given me anything stating my employment or training status, identifying the policy or authority under which I am being held off clinical service, stating any allegation against me other than the September 23, 2026 dosing error, or telling me when the

exclusion ends. I have asked for each of those things, more than once, and received none of them.

89. On October 12, 2026, Ms. Pyke wrote that I am "not on any sort of administrative leave," that "there is no formal investigation being performed," and that I am "simply not permitted to work on clinical cases until further notice." On October 14, 2026, the same office wrote that the matter is "pending further review" and "remains under review." True and correct copies are attached as Exhibit 25.

90. On October 16, 2026, the University's central Office of Human Resources, to which I had escalated, answered none of the five written questions I had asked and directed me back to the same people. A true and correct copy is attached as Exhibit 26.

91. The Civil Rights Compliance Office opened an investigation on October 13, 2026 and issued Notices of Allegations on October 15, 2026 naming Dr. Toribio and Dr. Hostnik as respondents in a formal investigation of disability discrimination and harassment. No supportive measure of any kind has been offered to me, before or since.

92. Dr. Toribio has not communicated with me at all since September 24, 2026.

93. I am required to attend the occasional in-person class or research presentation at the school. Whenever I attend, one of the students invariably comes up to me and asks where I have been. It takes all my strength to not break down in tears when I have to tell them that I am currently prohibited from performing clinical duties.

94. I am in Columbus. I am available and I am ready to work. I spend each day in my apartment doing nothing.

M. My board examination, and the American College of Veterinary Internal Medicine

95. To register for the 2027 ACVIM General Examination I needed my academic advisor to sign an authorization letter confirming the dates of my program and my satisfactory progress. It therefore required Dr. Toribio's signature.

96. I asked Dr. Toribio in writing to sign it on October 2, 2026 and again on October 13, 2026. He did not respond to either request until the actual day of the deadline, October 15, 2026. A true and correct copy of my requests is attached as Exhibit 27.

97. On November 1, 2026, I wrote to the American College of Veterinary Internal Medicine, the organization that credentials my residency, asking how an extended period off clinical service and off on-call service would be treated if I continued to satisfy the minimum weeks required under my Resident Training Objective form, and whether ACVIM has a process for inquiring of a program when a resident's training is interrupted for an extended period without a stated basis. In the same message I asked to change my Resident Advisor from Dr. Toribio to Dr. Burns. A true and correct copy is attached as Exhibit 28.

98. On November 3, 2026, Krysta Chapin of ACVIM replied that ACVIM would "reach out to your Program Director to better understand your current training status," that it might involve the Residency Training Committee "to determine how this time should be documented for credentialing purposes," and that it had noted my request to change my Resident Advisor to Dr. Teresa Burns. A true and correct copy is attached as Exhibit 29.

99. ACVIM has since informed me that Dr. Burns has agreed to serve as my Resident Advisor.

100. ACVIM has also informed me that it has received no response from the University to its questions about the basis for my removal from clinical service, its expected duration, or how my lost training time will be treated for residency credit.

N. What this is costing me

101. Every week I am held off clinical service is a week of required training I cannot perform later. My appointment ends July 14, 2028, and the weeks that remain are already committed to the training they were scheduled to provide. Clinical time is not interchangeable with other work, and it cannot be bought.

102. Board certification is the purpose of a specialty residency and the basis on which I will be hired for the rest of my career. Eligibility to sit for the examination depends on completing the required clinical training, which is the training I am not being permitted to perform.

103. I continue to receive my base salary. I do not receive the per-shift compensation I earned for after-hours emergency shifts, because I am not permitted to work them. But my salary is not what I am losing. What I am losing is the training, the credential, and the time. If I am not able to complete this residency I will most likely never be able to become a board certified equine internist, and will never be able to work as an internist in an equine hospital, which has always been my career goal and for which I have worked exceedingly hard.

104. I did not come to this Court first. I reported internally on September 24. I sat for an interview and waited the week I was told to wait. I escalated to University Human Resources. I filed with the Civil Rights Compliance Office. I contacted the organization in charge of my internal medicine residency, the ACVIM (American College of Veterinary Internal Medicine). My counsel wrote to the Office of Legal Affairs seven times. I filed a charge with the Equal Employment Opportunity Commission. Not one of those steps has returned a single day of my training to me.

105. Dr. Teresa Burns is a member of the section faculty. She is not a respondent in the University's investigation. She has agreed to serve as my advisor. If I am returned to clinical service under her supervision, I can resume my training immediately.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. 28 U.S.C. § 1746.

Executed on November 24, 2026, at Columbus, Ohio.

Sarah H. Gabriel, DVM